Cooper v. Seaverns.

FANNIE M. COOPER, *Appellant*, V. SUSAN SEAVERNS, *Appellee*.

No. 16,080.

SYLLABUS BY THE COURT.

1. SLANDER—*Charge of Unchastity—"Dirty Slut."* According to their usual, popular and natural signification the words "dirty slut," spoken of a woman, do not of themselves impute unchastity.

2. —— *Pleading—Innuendo.* In an action for slander based on the words referred to their meaning can not be expanded to include unchastity merely by the innuendo of the petition. If in the light of the occasion and circumstances of their utterance they conveyed such a meaning the extrinsic facts showing they were defamatory should be pleaded in the prefatory part of the petition.

3. —— *Sufficient Charge of Unchastity.* The following words spoken of a married woman—"I suppose that you have heard the slander that's going about the Coopers; that little girl was born within four or five months after they were married; now what do you think of them?"—fairly mean the woman's child was begotten out of lawful wedlock and that she had been guilty of a breach of chastity.

4. —— *Allegation and Proof of Special Damages—Common-law Rule.* The rule of the common law that spoken words imputing unchastity to a female are not actionable without allegation and proof of special damages took its rise in England from conditions peculiar to that country and is based upon reasons which are not apposite under the legal institutions of this state. It is out of sympathy with the true spirit of the bill of rights, lacks the sanction of justice and right,

and does not apply to the conditions or meet the needs of the people of this state.

5. COMMON LAW—*Statute Continuing it in Force—Limitation.* Under the statute of 1868 (Gen. Stat. 1901, § 8014), which governs the matter, the common law of England remains in force in this state in aid of the general statutes only so far as it is not modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people.

6. ———— *Modification of Common Law a Judicial Question.* It is a judicial question whether the common law invoked in a judicial proceeding has been modified by any of the means pointed out in the statute, and consequently to what extent it remains in force in this state.

7. SLANDER—*Charge of Unchastity Actionable without Alleging Special Damages.* The rule of the common law referred to in paragraph 4 is not a part of the law of this state, and spoken words imputing unchastity to a female are actionable without allegation or proof of special damages.

Appeal from Wallace district court; JACOB C. RUP-PENTHAL, judge. Opinion filed December 11, 1909. Reversed.

*W. S. Roark,* for the appellant.

*Lee Monroe,* and *George A. Kline,* for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action in the district court was one for slander. The petition contained two counts. In the first count it was charged that the defendant said the plaintiff is a "dirty slut." The innuendo was that the words meant the plaintiff is an unchaste woman. In the second count it was charged that the defendant spoke of the plaintiff as follows: "I suppose that you have heard the slander that's going about the Coopers; that little girl was born within four or five months after they were married; now what do you think of them?" The innuendo was that the words meant that the plaintiff's first child was begotten out of lawful wedlock and that the plaintiff had been guilty of a breach of chastity. No special damages were alleged.

Cooper v. Seaverns.

A demurrer was sustained to the petition, and the plaintiff appeals.

Formerly it was held in slander cases that the words spoken were to be construed in their mildest sense, but that doctrine has long since been abandoned. They should be given their usual, popular and natural meaning, according to the circumstances under which they were used, on the assumption that the hearer so understood them. The words "dirty slut" do not import unchastity. None of the dictionaries assigns to them any such signification. In the Century Dictionary, which is usually careful to give all extensions of meaning beyond the ordinary, the word "slut" is defined and its use is illustrated as follows:

"1. A careless, lazy woman; a woman who is uncleanly as regards her person or her house; a slattern; often used as a name of contempt for a woman and (formerly) also for a man. See *sloven.*

"Our radient queen hates sluts and sluttery."—Shak., M. W. of W., v. 5, 50.

"2. A young woman; a jade; a wench: used lightly.

"Our little girl Susan is a most admirable slut, and pleases us mightily, doing more service than both the others."—Pepys, Diary, Feb. 21, 1664.

"You see now and then some handsome young jades among them (Gipsies); the sluts have very often white teeth and black eyes."—Addison, Spectator, No. 130.

"3. An awkward person, animal, or thing.
"Crabbe is a slutt to kerve, and a wrawd wight;
Breke euery clawe a sondur."
—Babees Book (E. E. T. S.), p. 158.

"4. A female dog; a bitch.

"'You see I gave my cousin this dog, Captain Woolcomb,' says the gentleman, 'and the little slut remembers me.'"—Thackeray, Philip, xiii."

While quoting from the masters of English speech the editors of this work might have given space to the one from whom every child's notion of the words in question is obtained:

"See-saw, Margery Daw,
Sold her bed and lay upon straw;
Was not she a dirty slut,
To sell her bed and lie in the dirt?"
—Mother Goose.

The latest authoritative standard, Webster's New International Dictionary (1909), notes no enlargement of the foregoing meanings, and the courts have recognized none except where the circumstances and connection so indicated. (25 Cyc. 322, and cases cited.)

The plaintiff says, however, the meaning of the defendant's language was properly expanded to include a slanderous imputation by means of the innuendo. The innuendo performs no such service. It can not extend or add to the sense of words. If the words themselves are defamatory, no innuendo is necessary. If they are not themselves defamatory, and become so only in the light of the occasion and circumstances of their utterance, the extrinsic facts showing the meaning actually conveyed must be stated in the prefatory part of the pleading and not in the innuendo. If the words alone or the words illuminated by circumstances duly pleaded be not defamatory, the innuendo can not make them so. If the words alone or the words explicated by the attendant facts be susceptible of more than one meaning, or be ambiguous or equivocal, the innuendo may assign the true meaning the plaintiff believes they should bear. But in no case can it introduce new facts, and it serves merely to connect, explain and apply what precedes it in the statement of the cause of action. (1 Cooley, Torts, 3d ed., p. 414; 25 Cyc. 449; 13 Encyc. Pl. & Pr. 49.) In this case no facts were alleged showing that the words forming the basis of the first count of the petition bore other than their usually accepted signification, and the introduction of a broader meaning in the innuendo alone was not permissible.

"Several sets of words are set out in the declaration as being false, scandalous, malicious and defamatory, and, among others in the second count, are the following: 'She is a dirty bitch.' 'She is a dirty slut.' 'She is a dirty, lying slut.' 'She is a filthy, lying slut.' These words are laid without any colloquium going to show that they were used and understood in a slan-

derous sense. They must, therefore, be taken in their common acceptation. . . . The word 'slut,' according to Webster, means an untidy woman, a slattern, and also a female dog, the same as 'bitch.' While such terms undoubtedly are coarse, vulgar and brutal, when applied to a woman, they do not amount to a charge of crime or of want of chastity, and are not, therefore, in their common meaning, slanderous words." (*Roby v. Murphy*, 27 Ill. App. 394, 397, 398.)

According to the rule of interpretation already stated, the defendant's assertion respecting the plaintiff appearing in the second count of the petition fairly conveys the meaning assigned to it in the innuendo, and the question arises whether words imputing want of chastity to a woman are actionable in this state without an allegation of special damages.

The common law of England was that verbal imputations of unchaste conduct on the part of a female were not actionable, in the absence of special damages, unless they related to a person in some office or employment for which morality and virtue were qualifications (Folkhard, Law Slan. & Lib., 7th ed., p. 43), and except in the local courts of the city of London, the borough of Southwark and the city of Bristol, where it was the custom to whip strumpets at cart's tail, tingling a basin before them (Odgers, Lib. & Slan., p. *84). Ths rule has been accounted for on the supposition that in the early, formative days of the common law social relations were rude, manners were unrefined, and the people were accustomed to hearing gross and vulgar epithets freely tossed about without regarding them seriously. (Odgers, Lib. & Slan., *p. 86.) The case of *Oxford & ux. v. Cross,* in the king's bench, Trinity term, 41 Elizabeth (1599), Coke's Reports (vol. 2, p. 307; part 4, p. 18a), is cited in support of this view, wherein it was said that a custom "to maintain actions for such brabling words is against law." Pollock and Maitland discover a better state of

civilization from the early records than the view in-
dicated takes for granted:

"We should be much mistaken, however, if we be-
lieved that the temporal law of the middle ages gave
no action to the defamed. Nothing could be less true
than that our ancestors in the days of their barbarism
could only feel blows and treated hard words as of no
account. Even the rude *lex Salica* decrees that if one
calls a man 'wolf' or 'hare' one must pay him three
shillings, while if one calls a woman 'harlot,' and can
not prove the truth of the charge, one must pay her
forty-five shillings. The oldest English laws exact *bót*
and *wíte* if one gives another bad names. In the Nor-
man Custumal it is written that the man · who has
falsely called another 'thief' or 'manslayer' must pay
damages, and, holding his nose with his fingers, must
publicly confess himself a liar. Shame was keenly felt.
In almost every action before an English local court of
the thirteenth century the plaintiff will claim compen-
sation, not only for the damage (*damnum*) but also for
the shame (*huntage, hontage, dedecus, pudor, vitu-
perium*) that has been done him, and we may suspect
that in the king's court this element was not neglected
when compensation was awarded. But further, we
find that in the local courts, not only were bad words
punished upon presentment in a summary way, but
regular actions for defamation were common. We may
gather that in such an action the defendant might
allege that his words were true; *veritas non est de-
famatio.* We may gather that the English for *meretrix*
was actionable, though an interchange of this against
the English for *latro* left one shilling due to the man.
We already hear that a slander was uttered 'of malice
aforethought,' and sometimes a plaintiff alleges 'special
damage.' But until further researches have been made
among the records of our manorial courts we shall
know little of the medieval law of defamation. Prob-
ably in this matter those courts did good enough jus-
tice, and for this reason it was that no royal writ was
devised for the relief of the slandered." (2 Poll. &
Mait., Hist. Eng. Law, 2d ed., p. 537.)

This being true, a reason for the rule must be found
elsewhere than in any essential brutality of the early

Englishman. The doctrine appears to be fully accounted for through the partition of authority in England between the spiritual and the temporal courts. (Odgers, Lib. & Slan., *p. 86.) It is familiar history that in the middle ages, for reasons and by means which need not be sketched here, the all-powerful ecclesiastics acquired jurisdiction over a large portion of the most important concerns of life—testaments, matrimony, and among innumerable others, defamation. This breach of the social order was regarded as a sin and was punishable in the spiritual courts as such.

"When the old moots were decaying, the ecclesiastical procedure against the sin of defamation seems to have been regarded as the usual, if not the only, engine which could be brought to bear upon cases of libel and slander." (2 Poll. & Mait., Hist. Eng. Law, 2d ed., p. 538.)

"The king's court gave no action for defamation. This in our eyes will seem both a serious and a curious defect in the justice that it administered. What is usually accounted the first known instance of such an action comes from the year 1356, and even in that instance the slander was complicated with contempt of court. In 1295 a picturesque dispute between two Irish magnates had been removed to Westminster, and Edward I's court declared in solemn fashion that it would not entertain pleas of defamation; in the Irish court battle had been waged. At the end of the middle ages we may see the royal justices beginning to reconsider their doctrine and to foster an 'action on the case for words'; but they were by this time hampered by the rival pretensions of the courts Christian. The tribunals of the church had been allowed to punish defamation as a sin, and the province which had thus been appropriated by the canonists was not very easily recovered from them until the Protestant reformation had weakened their hands." (2 Poll. & Mait., Hist. Eng. Law, 2d ed., p. 536.)

The struggle to limit and define the authority of the ecclesiastical courts was long and bitter, and frequently

18—81 KAN.

exhibited some striking features. In the progress of the duel the common-law courts used as their principal weapon the king's writ of prohibition to restrain the exercise of jurisdiction over causes which they desired to adjudicate. The ecclesiastics returned the fire by excommunicating those who sued out such writs. By and by an increasing number of pecuniary matters came to be regarded as pertaining to things of this world, and the civil courts finally succeeded in maintaining their right to administer relief in an action on the case where specific damages were occasioned by slanderous words. In Lord Coke's time the jurisdiction of the spiritual courts over defamation was declared as follows:

"Touching defamations determinable in the ecclesiastical court, it was resolved, that such defamation ought to have three incidents: 1. That it concerns matter merely spiritual and determinable in the ecclesiastical court, as for calling him 'heretic, schismatic, adulterer, fornicator, &c.' 2. It ought to concern matter merely spiritual only; for if such defamation touches or concerns anything determinable at the common law, the ecclesiastical judge shall not have cognizance of it. 3. Although such defamation is merely spiritual, and only spiritual, yet he who is defamed can not sue there for amends or damages, but the suit ought to be only for the punishment of the sin, *pro salute animae*." (*Palmer v. Thorpe*, K. B., Trin. term, 25 Eliz. [1583], Coke's Rep., vol. 2, p. 315; part 4, p. 20*a*.)

If, however, special damages ensued from a defamation the action was triable in the common-law courts.

"It was resolved, if the defendant had charged the plaintiff with bare incontinency, yet the action should be maintainable: for in this case the ground of the action is temporal, sc. that she was to be advanced in marriage, and that she was defeated of it, and the means by which she was defeated was the same slander, which means tending to such end, shall be tried by the common law. So if a divine is to be presented to a benefice and one to defeat him of it says to the patron, 'that he is an heretic, or a bastard, or that he is excommunicated,' by which the patron refuses to present him

(as he well might if the imputations were true) and he loses his preferment, he shall have his action on the case for these slanders tending to such end.  And if a woman is bound that she shall live continent and chaste; or if a lease is made to her *quamdiu casta vixerit,* in these cases incontinency shall be tried by the common law.  And Popham, chief justice, said that if one says of a woman that keeps an inn, that she has a great infectious disease, by which she loses her guests, she shall have an action on the case." (*Davis v. Gardiner,* Com. Pl., Trin. term, 35 Eliz. [1593], Coke's Rep., vol. 2, p. 302; part 4, p. 16*b*.)

Beyond this the temporal courts were unable to go. After long agitation of the matter the jurisdiction of the ecclesiastical courts of England and Wales over defamation was finally abolished altogether by an act of 1855, the preamble of which reads:

"Whereas the jurisdiction of the ecclesiastical courts in suits for defamation has ceased to be the means of enforcing the spiritual discipline of the church, and has become grievous and oppressive to the subjects of this realm: Be it therefore enacted by the queen's most excellent majesty," etc.  (18 & 19 Vict. ch. 41.)

A similar act relating to Ireland was passed in 1860. (23 & 24 Vict. ch. 32.)  In Scotland verbal imputations of unchastity were actionable without proof of special damages.  Townsend, in the fourth edition of his work on Slander and Libel, at page 46, quotes Historical Law Tracts, page 225, as follows:

" 'I am not certain,' says Lord Kames, 'that in England any verbal injury is actionable, except such as may be attended with pecuniary loss or damage.  If not, we in Scotland are more delicate.  Scandal, or any imputation upon a man's good name, may be sued before the commissaries, even when the scandal is of such a nature that it can not be the occasion of any pecuniary loss.  It is sufficient to say, I am hurt in my character.' "

In the case of *Aiken v. Reat,* 7 Murray 149, it was said: "By the law of Scotland anything defamatory is the foundation of an action."

The statutes abolishing the jurisdiction of the ecclesiastical courts over defamation did not augment the authority of the civil courts. They were still bound by the fetters of the common-law rule that special damages must be alleged and proved or no right of action exists until 1891, when the slander of women act was passed. Section 1 reads as follows:

"Words spoken and published after the passing of this act which impute unchastity or adultery to any woman or girl shall not require special damage to render them actionable.

"Provided always, that in any action for words spoken and made actionable by this act, a plaintiff shall not recover more costs than damages, unless the judge shall certify that there was reasonable ground for bringing the action." (54 & 55 Vict. ch. 51.)

By section 2 it was provided that the act should not apply to Scotland.

Although the English judges felt constrained to follow the common-law rule until it was superseded by act of parliament, it did not satisfy their consciences. In 1759, in the case of *Jones v. Herne,* in the court of king's bench (2 Wil. 87, 95 Eng. Rep., Full Reprint, 701), Chief Justice Willes, after holding it actionable to say a man is a forger, added that if it were *res integra* he would hold that calling a man a rogue or a woman a whore in public company is actionable.

Very near the time when this state entered upon its separate constitutional existence the common-law rule fell under the censure of some of the ablest exponents of English justice. The case of *Lynch v. Knight,* 9 House of Lords Cases, *577, was decided in 1861. The judgment of the lord chancellor, Lord Campbell, was read in the house of lords on July 17 by Lord Brougham. It contained the following words, which if possible are the more weighty because of the death of the great chancellor on the previous 23d of June:

"I may lament the unsatisfactory state of our law, according to which the imputation by words, however

gross, on an occasion, however public, upon the chastity of a modest matron or a pure virgin, is not actionable without proof that it has actually produced special temporal damage to her: but I am here only to declare the law." (Page *592.)

In delivering his own judgment Lord Brougham said:

"I must add that I entirely agree with what my late noble and learned friend says toward the end of his judgment. He laments the unsatisfactory state of our law, according to which the imputation by words, however gross, on an occasion however public, upon the chastity of a modest matron or a pure virgin, is not actionable without proof that it has actually produced special temporal damage to her. The only difference of opinion which I have with my noble and learned friend is, that instead of the word 'unsatisfactory' I should substitute the word 'barbarous.' I think that such a state of things can only be described as a barbarous state of our law in that respect." (Page *594.)

In the case of *Roberts v. Roberts,* decided by the court of queen's bench in June, 1864 (5 Best & Smith, *384), Chief Justice Cockburn said:

"I think that to prevent a woman whose character for chastity is assailed from bringing an action for the purpose of vindicating it is cruel; but, as the law at present stands, such an action is not maintainable unless it be shown that the loss of some substantial or material advantage has resulted from the speaking of the words. That is not shown in this declaration, and therefore I reluctantly hold that the demurrer is good. If upon further inquiry anything can be found amounting to such special damage as the law requires, the plaintiffs may have leave to amend their declaration." (Page *388.)

Justice Crompton expressed the wish that the law in the case of words affecting the chastity of a woman might be different from what it was, and Justice Blackburn said:

"The law upon the subject of disparaging words spoken of other persons is not in a satisfactory state. For words written an action is maintainable, though

possibly not more than one farthing damages could be obtained, whereas for words spoken imputing unchastity to a woman no action can be maintained unless special damage is shown." (Page *390.)

Since the passage of the slander of women act Sir Frederick Pollock has expressed himself as follows:

"The courts might without violence have presumed that a man's reputation for courage, honour, and truthfulness, a woman's for chastity and modest conduct, was something of which the loss would naturally lead to damage in any lawful walk of life. But the rule was otherwise, and remains so as regards all slanders of this kind against men, and against women also as regards all charges of improper conduct short of unchastity, which yet may sometimes be quite as vexatious, and more mischievous because more plausible. The law went wrong from the beginning in making the damage and not the insult the cause of action; and this seems the stranger when we have seen that with regard to assault a sounder principle is well established.

"A remedy coextensive with the defect was provided as long ago as 1857 by the legislature of the Bahama Islands. The imperial parliament might have followed the example with advantage." (Pollock, Torts, 8th ed., p. 246, and note.)

In 1902 a writer in the English magazine, *The Law Quarterly Review*, made the following observations:

"If an intelligent foreigner, having an intimate acquaintance with the legal systems of modern Europe, were asked after *a priori* consideration to pronounce on the authenticity or otherwise of some half dozen or so main propositions in the English law of defamation, it is safe to say that in the majority of instances his pronouncement would be wrong. If, for example, he were to be asked whether or no he thought it possible that an English lady could in the end of the nineteenth century be assailed by spoken slander imputing the vilest forms of unchastity, without any civil remedy whatsoever, he would not hesitate in saying 'No.' But yet, until 1891, the imputation of adultery to a married woman, however malicious and industrious the circulation of the lie, was not *per se* actionable. The slander of women act, however, of that year, for us marked a

Cooper v. Seaverns.

very great advance. For it quickened the atrophy of centuries and actually, in one small respect, made our law as civilized as that of the Mosaic system of more than three thousand years sooner. Still, we are conservative, and the act did not go very far. For even now the imputation of lightness and immorality, provided that it fall short of the very carnal offense, is without remedy; and the above grudging concession to the female sex is restricted to them; and for men the ruling of *Lumby v. Allday* (1 Cr. & J. 301; 1 Tyr. 217; 35 R. R. 715) it still law, though a man's reputation for decency and courage is not less dear to him than her fair fame is to a woman." (Vol. 18, p. 255.)

From the foregoing it appears that the rule under consideration resulted solely from the early seizure of jurisdiction over slander by the ecclesiastical courts, which could not award damages at all, and the inability of the temporal courts to strip that jurisdiction from their rivals except in cases involving special damages. It never did rest upon any principle of right or justice or any decent regard for character. It was unsuited to the true genius and real needs of the people over whom it tyrannized, even from the earliest times. It created anomalies in the law of defamation which rendered that law absurd and grotesque. For example, words "touching" some disreputable good-for-nothing in his work or trade were actionable. The most sensitive, cultivated, high-bred woman could be foully slandered with impunity. Written ridicule of the style of her hat gave ground for exemplary damages. She had no redress for spoken words inflicting one of the deepest wounds her sex can suffer. The rule was not merely insufferably wrong; it was wrong in a matter of so precious a nature that it was shocking. It was suppressed because it had long been reprobated as odious and was universally detested. The question now to be decided is, Does that rule obtain in this state?

In the case of *Clark v. Allaman,* 71 Kan. 206, the importation of the common law into Kansas was described

in detail and its authority here was discussed. The first paragraph of the syllabus reads thus:

"From the time of their acquisition by the United States until 1868 the common law was prevalent over the separate portions of the region from which the state of Kansas was erected, under all civilized forms of governmental organization established for them; and from 1855 until 1868 the common law, not inconsistent with the constitution of the United States, the Kansas-Nebraska act, or statute law, was the rule of action and decision, any law, custom or usage to the contrary notwithstanding."

In 1868 the statute now in force was enacted. It reads as follows:

"The common law as modified by constitutional and statutory law, judicial decisions and the conditions and wants of the people, shall remain in force in aid of the general statutes of the state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object." (Gen. Stat. 1901, § 8014.)

In the case of *The State ex rel. Adams v. Hillyer*, 2 Kan. 17, decided in 1863, it was argued that a judgment of impeachment by the senate was of no effect because the common law regulating British parliamentary impeachments had been disregarded in certain respects. The court said:

"In the absence of express provisions it is presumed that the common law 'will regulate, interpret and control the powers and duties of the court of impeachment,' but this rule, applicable only to the trial and proceedings, affords no guide in determining the question as to the organization of the court, for in this state the tribunal that tries, as well as the body that prefers the accusation, are entirely unknown to the common law, and if there is such a general resemblance of our legislative assembly to the parliament of Great Britain as to be easily noticed, the points of dissimilarity are still more apparent and striking. And this, not only in the organization and general powers of the two bodies, but

even in this matter of impeachment. . . . This right of the commons to be present in cases where the impeachment was presented by them grows out of the assumed right of the commons to arrest the prosecution by refusing to demand judgment, even after the person impeached has been found guilty. Such power has never been exercised or claimed in this country by the house exhibiting the accusation, and would be utterly subversive of the independent jurisdiction of the senate as a court of impeachment, by subjecting the judgments of the senate to the review of the house before they would be of any force or effect.

"The reason of the usage or right of attendance upon the trial by the commons having failed, the rule itself ceases, as we have adopted no more of the common law in this state than is adapted to our situation and applicable to our institutions." (Pages 26, 27.)

In the case of *Harrington v. Miles,* 11 Kan. 480, it was held that words charging the stealing of a dog are actionable *per se* because, contrary to the common law, a dog is the subject of larceny in this state. The opinion reads:

"It seems impossible in the light of these legislative and judicial expressions to decide that a dog is not property, nor a thing of value. And while the common law is continued in force in this state it is only 'in aid of the general statutes,' and as modified by constitutional and statutory laws, judicial decisions and the conditions and wants of the people." (Page 484.)

In the case of *Duncan v. Baker,* 21 Kan. 99, the narrow, technical and illiberal rule of the common law forbidding recovery on *quantum meruit* after partial performance of an entire contract was rejected merely because it was not founded on justice and was contrary to the weight of modern authority.

In the case of *Lapere v. Luckey,* 23 Kan. 534, the syllabus reads:

"There is no such thing as 'ancient lights' in Kansas, and the doctrine of 'ancient lights' can not be recognized by the courts of Kansas; hence, where a petition sets forth nothing else for a cause of action than the ob-

struction of 'ancient lights,' the petition does not state any cause of action."

In the case of *Whitaker v. Hawley,* 25 Kan. 674, the court considered the common-law rule relating to the abatement of rent for leased buildings destroyed by fire, which the trial court had not followed. It was shown that the rule was peculiar to England, was contrary to the civil law, did not prevail in Scotland and elsewhere, and was contrary to natural justice. The court said:

"If the case before us rested upon the single question whether the rule of the common law is a part of the law of this state, we should be slow to disturb the decision of the district court. True, the common law is in force in this state, but only as made so by statute, and only then 'as modified by constitutional and statutory law, judicial decisions and the conditions and wants of the people.' " (Page 689.)

In the case of *Winn v. Abeles,* 35 Kan. 85, the opinion reads:

"It is further urged in behalf of the plaintiff that the Abeles building having stood for twenty years or more upon the land of another gave its owner a prescriptive right in such land for the support of his building. The old rule respecting ancient buildings invoked by the plaintiff, and which is said to be in analogy to the rule as to ancient lights, is a doctrine unsuited to the condition of things existing in this country, and which it has been decided can not be recognized or made applicable here." (Page 90.)

In the case of *Anthony v. Norton,* 60 Kan. 341, it was held that as a matter of fact a parent has a right of action for the seduction of his daughter because of the wrong to the parental relation and not because she is his servant; and, consequently, that the fiction of service need not be pleaded, as the common law required. In the opinion it was said:

"Many of the courts have deplored the lack of legislation to enable them to dispense with the fiction in question, so as to allow them to bottom cases in theory

as well as in fact upon the actual and meritorious ground upon which the damages are really awarded. If by this is meant legislation which in express terms abrogates the fiction of the relation of master and servant, we deny its necessity in this and other states which have adopted the reformed code of procedure. The code was devised for the very purpose of dispensing with legal fictions and antiquated forms of action. Its spirit in this respect can be illustrated by a score or more of its provisions. Out of them one general rule of reform is collectable, and that is that the actual facts from which the claimed right of action is deducible must be stated. . . . Damages, therefore, in respect to the violated parental relation are the facts which the code ordains shall be stated in the petition, and the pretense of services lost to the parent as a master is the legal fiction of pleading which the code ordains shall be abolished. If necessity ever existed for cloaking the real cause of action under the nominal disguise of another one it no longer exists, and we hold accordingly. In this state a parent may maintain an action for the seduction of the daughter without averment or proof of loss of services or expenses of sickness." (Pages 349, 351.)

In the case of *Clark v. Allaman,* 71 Kan. 206, the court indicated its veneration for the common law as a system and duly acknowledged the general authority of its rules, but said:

"It will not be denied that in every state particular rules of the common law, as it existed in England prior to the fourth year of the reign of James I, are not consciously regarded as binding; many others are consciously rejected, and new rules, the product of American conditions, departing widely from the English common law in fact, and quite indifferent to it in theory, become established and must be recognized as of controlling authority. Rules of law have their birth, growth and decay, like generations of men, and in order to meet the expanding needs of the inhabitants of the young commonwealth the legislature enacted the statute of 1868 continuing in force the common law only as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people." (Page 229.)

The legislature has not expressed itself on the subject

of the common-law doctrine under consideration. The constitution, however, contains the following provisions:

"The liberty of the press shall be inviolate; and all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such right."

"All persons for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." (Bill of Rights, §§ 11, 18; Gen. Stat. 1901, §§ 93, 100.)

It is true that constitutional documents of this character are interpreted according to the common law. But in a state where the most profound respect for the character of its womanhood is native to the people imputations of the kind in question can not be regarded otherwise than as abuses of the right of free speech. Such is the plain fact, and, being abuses, responsibility ought to follow for their utterance. The incurable wound to the victim's feelings, the contempt and disrepute into which she is plunged, her exclusion from the society of the pure and other degrading consequences of the slander are the direct kinds of injuries suffered in reputation. Such, again, is the plain fact, and for such injuries she ought to have remedy by due course of law, which under our procedure is by civil action in the district court. Therefore the common-law rule is at least out of sympathy with the true spirit and purpose of these provisions of the bill of rights.

The rule had its origin in, and derived its authority from, a dual judicial establishment not only unknown in this country but contrary to the theory and opposed to the organic frame of our institutions. The reason failing, the rule should fail, as in the case of Hillyer's impeachment (2 Kan. 17), supra.

This is not the case of a principle which commands considerable approval, is founded upon fair reason, is merely of questionable wisdom, and which therefore ought to be followed until abrogated by the legislature.

It is the case of an outlawed rule of negation whose sole function has always been to thwart natural justice in one of the dearest and tenderest of human interests. Therefore its rejection is justified by *Duncan v. Baker* (21 Kan. 99) and *Whitaker v. Hawley* (25 Kan. 674), supra.

The world is censorious, and a woman's or a maiden's reputation for modesty and chastity is an asset of inestimable value. Its loss renders her poor indeed. Injury in fact is the necessary result of such a deprivation, whether or not the sufferer can point to specific damage in a few paltry dollars or to liability to a trifling fine if the charge were true. Therefore the pleading of special damages as a basis for relief ought to be treated as a useless fiction, like the one condemned in *Anthony v. Norton* (60 Kan. 341), supra.

Taking into consideration the origin and history of the rule, the reason supporting it, its character, its consequences, and the degree of its appositeness to our constitution and system of laws, it does not apply to the conditions or meet the needs of the people of this state, and consequently it is not a part of the law of this state.

This problem has been met and solved by different states of the American Union in different ways. In some the rule is obediently observed. In some it is followed under protest—is characterized as a disgrace to the state—but still is followed. In some statutes have relieved from its iniquity in whole or in part. In some it is frankly repudiated by the courts because it lacks the sanction of reason and justice. This court has no legislative functions. As Lord Campbell said, it is here only to declare the law. Under the statute of 1868 it must determine whether a rule of the common law invoked in a judicial proceeding contravenes the constitution or statutes of the state, or has been modified by judicial decision, and whether it is adapted to the conditions and is suitable to the needs of the people of the

state. This duty has been discharged in the present case.

The judgment of the district court is reversed, and the cause is remanded with instructions to overrule the demurrer to the second count of the petition.