No. 45,067

FRANK P. SHARMAN, FRANK RAPSTINE, AND GENE RAPSTINE, *Appellants* and *Cross-Appellees,* v. WEBBER SUPPLY COMPANY, INC., and H. N. JUEL, d/b/a JUEL WATER WELL DRILLING COMPANY, *Appellees* and *Cross-Appellants.*

(441 P. 2d 867)

Opinion filed June 8, 1968.

*Shelley Graybill,* of Elkhart, argued the cause and was on the briefs for the appellants and cross-appellees.

*Leland E. Nordling,* of Hugoton, argued the cause, and *A. E. Kramer* and *Bernard E. Nordling,* both of Hugoton, were with him on the briefs for the appellees and cross-appellants.

The opinion of the court was delivered by

KAUL, J.: This controversy stems from an oral agreement to drill and complete irrigation wells to produce water for the irrigation of four quarter sections of land in Morton County.

The action was brought by plaintiff-appellants, who are also cross-appellees to quiet the title to the four quarter sections of land and to dissolve mechanics' liens filed thereon by defendants-

appellees and cross-appellants. For the sake of brevity, the parties will be referred to as plaintiffs and defendants.

The defendants filed separate answers and cross-petitions.

The trial court heard the case without a jury and made extensive findings of fact and conclusions of law. There is little dispute concerning the facts as found. Plaintiffs concede that though there was conflicting testimony on almost all points, the facts as found are supported by competent evidence. The contentions on appeal are basically that the trial court should have found additional facts and that the facts as found do not support the conclusions of law.

·We shall summarize the findings and conclusions of the trial court which have a bearing on the issues involved in this appeal and cross-appeal.

Plaintiffs, Sharman and the two Rapstines, were the owners of the four quarters of land in question. Sharman had full authority from the other owners to enter into contracts pertaining to the development of irrigation on the land.

Defendant Juel, doing business as the Juel Water Well Drilling Company, was engaged in the business of drilling water wells for irrigation purposes.

The defendant Webber Supply Company, Inc., referred to hereafter as Webber, was engaged in the business of test pumping irrigation wells and in selling pumping equipment. Kenneth Schofield was the manager of Webber's pumping department.

Leonard Gepner was engaged in the business of drilling test holes to be used in locating irrigation wells.

In February 1965, Sharman and Juel entered into an oral agreement for the purpose of producing water to irrigate plaintiffs' land. Juel was to drill and complete usable wells capable of producing not less than 800 gallons of water per minute of usable irrigation water for the price of $12.50 per foot. A completed well consisted of furnishing and installing the casing, gravel packing, filling of slush pits and cleaning up the land disturbed, together with the drilling of the well. The location and depth of the wells was to be determined by the parties, based upon test holes drilled by Gepner who was to be paid by Sharman. Webber was to do the test pumping which was to be paid, as the trial court found, by Sharman.

Operations were commenced on May 15, 1965. Two wells were drilled and completed to the satisfaction of plaintiffs on the North-

east Quarter of Section 33 and the Southeast Quarter of Section 2. Sharman paid Juel at the rate of $12.50 per foot for these two wells and also paid Gepner for the test hole drilling. Sharman also paid $250 and the cost of fuel used for the test pumping and purchased from Webber the pumping equipment to put these two wells in production. There is no dispute as to the productivity and allocation of cost for these two wells.

Juel next drilled a well on the Northeast Quarter of Section 15 which was test pumped by Webber and produced only 300 gallons of water per minute. Sharman and Juel agreed this well was not usable and Juel made no charges for his drilling. Webber billed Sharman $275.74 for test pumping and fuel on this well. Sharman denied Webber's bill and contended that Juel agreed to pay for the test pumping on nonusable wells. The trial court found against Sharman on this point.

Drilling was next commenced on the Northwest Quarter of Section 33 and the operations on this quarter are the subject of the controversy between Sharman and Juel and also between Sharman and Webber, with the exception of one test pumping on the Northeast Quarter of Section 15.

The first well drilled on the Northwest Quarter of Section 33 test pumped 1100 to 1400 gallons of water per minute but produced so much sand that the parties agreed it was not a usable well. The well was test pumped two more times by Webber but was not found to be satisfactory to either Sharman or Juel. The casing was pulled from the No. 1 well and well No. 2 was started, but due to "caving in" problems, this well was also abandoned by agreement. A third well was then drilled to a depth of 352 feet and was completed as a well capable of producing 600 gallons of water per minute after being acidized by, and at the expense of, Juel. This third well was also test pumped twice by Webber. The five separate test pumpings (3 on No. 1 and 2 on No. 3) on the Northwest Quarter of Section 33, together with one test pumping on the Northeast Quarter of Section 15, constitute Webber's claim against plaintiffs and the basis of its mechanic's liens. As we have noted, the basic dispute between Sharman and Webber is whether Juel was to pay Webber for test pumping on all nonusable wells—plaintiffs claimed they were only obligated to pay for test pumping on usable wells.

Preparatory to the drilling of the three wells on the Northwest

Quarter Section, fourteen test wells were drilled by Gepner. After the drilling of No. 3 well Gepner, on November 19, 1965, commenced and drilled a "deep test hole" to a depth of 600 feet. All fifteen of these test holes, drilled by Gepner, were billed to and paid by Sharman. During the efforts to bring in a usable well on the Northwest Quarter of Section 33, Sharman and Juel had several conversations in which they discussed the feasibility of drilling other test holes and wells at a deeper depth or at other locations on the quarter section. In the meantime, a maize crop was maturing on the quarter section involved.

Juel checked the deep hole test and was of the opinion it showed too much sand to be a good location for a usable well. On November 28, Juel called Sharman, who was in Amarillo, Texas, at the time, and reported the sand conditions of the deep test hole. During this telephone conversation Sharman told Juel "just as soon as Gene got the maize off and wouldn't ruin any more ground, we will go in and see if we can find another test along the line somewhere."

The trial court found that at this juncture Juel did not want to start another well because he needed more time to analyze the deep test hole cutting and did not want to destroy maize which was ready to cut, and that Sharman, during the autumn months, became more anxious to get a usable well on this quarter section.

On December 4 a telephone conversation was had by Juel and Schofield, with Gepner present, in the Webber office at Ulysses and Sharman and Frank Rapstine, on extension telephones, at Amarillo, Texas. By this time, as the trial court found, the drilling of the three wells on the quarter section had become costly to Juel and the drilling of the fifteen test wells had become costly to Sharman. Juel refused to drill a well and guarantee 800 gallons of water at the location of the deep test hole, and stated that he thought additional deep tests should be drilled to determine whether a usable well could be drilled along the submerged water line running diagonally across the quarter section. Sharman said he could not use a small well. In the course of the telephone conversation tempers flared.

Frank Rapstine entered into the conversation and told Juel that if he was not going to drill another well to pull up his rig and casing and go home, that they (plaintiffs) had contacted another driller. Juel answered if that is the way you are going to treat me, after all the money I have spent and the work I have done in trying to get you a usable well, then go get another driller.

Operations and further negotiations between plaintiffs and defendant were terminated with the telephone conversation.

The court found that 356 feet of casing, furnished by Juel, remained in well No. 3, and that Juel was entitled to remove it. The court further found that Sharman filled three slush pits on the Northwest Quarter of Section 33 and that Juel had filled other slush pits and smoothed the ground on the other three quarter sections.

The trial court found that subsequently the Hinkle Drilling Company drilled a well on the Northwest Quarter of Section 33. The well drilled by Hinkle produced 875 gallons per minute and was drilled under a contract calling for $13 a foot if a well produced more than 800 gallons or $8 a foot if it produced less.

Plaintiffs argue the trial court failed to make a specific finding on the issue whether plaintiffs or Juel was to pay Webber for test pumping on unusable wells. The conclusions made by the trial court clearly reflect that it considered the conflicting testimony and resolved the issue contrary to plaintiffs' contention; although in the calculations, on which the final judgment was arrived at, a portion of the test pumping costs was imposed as a setoff against Juel's claims. The testimony of Webber and Juel was in conflict with that of Sharman but since the trial court resolved the issue in favor of Webber, after hearing the conflicting testimony, the finding cannot be disturbed on appeal.

We note that Sharman, in his own testimony, admitted that he had been told by Schofield that Webber's charges were $500 for test pumping if Webber was not allowed to sell a pump.

This court is not concerned on appellate review with the credibility of witnesses or the weight of their testimony and the trier of facts, not the court on appellate review, has the responsibility of determining what testimony should be believed. (*Loucks v. McCormick,* 198 Kan. 351, 424 P. 2d 555, and cases cited therein.)

The trial court further concluded that since no evidence was introduced, establishing a contract rate for test pumping, quantum meruit applies; that the evidence established a customary rate for test pumping of $250, plus fuel, when a sale of pumping equipment is made by the pumper; when a sale is not made the rate is $500 per pumping, plus the cost of fuel used. The court further reasoned that in the absence of disagreements upon completion of the drilling on the Northwest Quarter of Section 33 that Webber would have sold pumping equipment on only one more well. Therefore, the

court determined that Webber was entitled to pay for one pumping on the Northeast Quarter of Section 15, four pumpings on the Northwest Quarter of Section 33, at the rate of $250 each, plus fuel, and one pumping at $500, plus fuel, on the Northwest Quarter of Section 33, since Webber could have sold only one more pump in any event. The court entered judgment for Webber in the amount of $2,199.98, based on this calculation.

Webber in its cross-appeal contends that, since no pumps were sold with respect to the drilling on the Northeast Quarter of Section 15 and the Northwest Quarter of Section 33, it was entitled to $500 for each test pumping and its judgment should be increased from $2,199.98 to $3,199.98. We have related the reasoning of the trial court which, we believe, correctly disposes of Webber's contention on this point.

We believe the findings of fact of the trial court, which were supported by competent evidence, in turn support the reasoning of the court in its conclusions with respect to Webber's claim. Therefore, the judgment of the trial court as to Webber should be and is affirmed as to both the appeal and cross-appeal.

The appeal of plaintiffs and cross-appeal of Juel, with respect to the controversy between plaintiffs and Juel, further involve the nature of test pumping and the trial court's calculations and reasoning in the application of the quantum meruit doctrine.

With respect to the controversy between plaintiffs and defendant Juel the trial court concluded:

"The telephone conversation of December 4, 1965, effectively terminated all oral contracts between Sharman and Juel and made it impracticable, to say the least, for Juel to do further drilling and thus fulfill his guaranty. Sharman was justified in hiring another driller. The Court is again applying the doctrine of quantum meruit and dividing the losses between said parties as equal fault or mutual agreement to cancellation.

"The cost of the three holes on NW 33-31-39 at $8.00 a foot would be approximately $6,900.00. Subtract $3,900.00 as the cost to Sharman for the services of Gepner and Webber leaves a loss of $3,000.00 to be divided equally between Sharman and Juel or a judgment for Juel against Sharman for $1,500.00. This would entitle Juel to pull the casing in Well No. 3. Costs are divided ½ to Sharman and ½ to Juel and Webber."

Both parties filed motions to amend findings of fact and conclusions of law which were overruled with minor exceptions.

In their appeal from the judgment in favor of Juel, plaintiffs concede that the finding by the trial court, as to the agreement between

Sharman and Juel, is supported by the evidence. Their position, as we are able to ascertain from their oral argument and brief, is that the finding, as to the agreement of the parties, is incomplete and requires clarification. They argue the trial court failed to find how many usable wells were to be drilled and who was to authorize the number, location, and depth of test holes to be drilled by Gepner. They also complain the trial court failed to find the period within which Juel was to complete the wells.

It is true, no specific findings were made concerning any agreement as to numbers, locations or depths of the wells to be drilled or any time limit for the completion of the wells. We find no testimony of either Sharman or Juel pertaining to the agreement upon which the court could have made such specific findings. Sharman testified that Juel was to have the wells completed in time to make a milo or corn crop. The product of the completed wells was piped together and a maize crop was produced and Sharman testified at one point that he decided not to drill another well on the Northwest Quarter of Section 33 until the maize crop was off.

The trial court found the terms of the agreement between Sharman and Juel, as we have related, and also that Gepner was hired and paid by Sharman; that the location and depth of the wells to be drilled by Juel was to be determined by the parties, based upon the test holes drilled by Gepner. From our examination of the record, we believe the trial court's findings reflect a fair analysis of the testimony and essentially covered the actual agreement reached between Sharman and Juel. Any brevity in the findings on this point reflects the failure of the parties to detail more specifically the terms of their agreement, rather than oversight by the court.

We have noted plaintiffs' contention that Juel agreed to pay Webber for test pumping unusable wells and find no error in the trial court's conclusion, based upon its findings, that Webber's agreement was with Sharman and called for payment by him for all test pumping on both usable and nonusable wells.

Plaintiffs further complain that the trial court erred in using the costs of five test pumpings, as a part of its formula, in applying the doctrine of quantum meruit on the ground that three of the test pumpings amounted to actually "surging" the well for the benefit of the driller, rather than constituting services for the landowners. The trial court heard the testimony of Webber's manager Schofield,

as to the customary manner of test pumping irrigation wells in the area. Schofield testified in an answer to a question by the court:

". . . A test pumping is when we set a test pump, that is a complete turbine deep well pump, attach our engine and surge and work this well to try to clean it up from sand and mud and when we accomplish this, then we put it on a test to see how many gallons a minute it will pump from so many feet so we will know how to design the equipment. One unit of pumping is when a pump is installed and then the pump is removed, and if test pumper comes back and re-installs the test pump in the same hole, it is another test. . . ."

The court also heard the testimony of Juel, as to customs of the trade with respect to charges by a test pumper when he furnishes pumping equipment, in view of a prospective sale, and where test pumping is done alone as a specific job. Juel testified that he had drilled wells for test pumping by others than Webber. We believe the record discloses the trial court was entirely familiar with the customs of test pumping in the community and its findings in this regard are supported by the evidence.

Plaintiffs contend that the findings of fact show Juel failed to fulfill his guaranty and it was error for the court to enter a quantum meruit judgment for $1,500 against them. They argue that the drilling of wells, capable of producing 800 gallons of usable water per minute, was a condition precedent to payment under the contract. Plaintiffs cite the familiar rule stated in *Wallerius v. Hare,* 194 Kan. 408, 399 P. 2d 543, that a condition precedent requires the performance of some act or the happening of some event before a right can accrue to enforce the main contract. The rule correctly states the law and is often applicable in an action for specific performance or breach of a contract. However, the rule is otherwise where the party, who has demanded the performance of the condition precedent, has prevented its happening or the performance thereof. Plaintiffs fail to note the further statement in *Wallerius* that:

"While the condition precedent must have happened before the contract can be enforced or relief sought in the way of specific performance, the party who has demanded the condition precedent cannot hinder, delay or prevent its happening for the purpose of avoiding performance of the contract. . . ." (p. 412.)

The rule announced in *Talbott v. Nibert,* 167 Kan. 138, 206 P. 2d 131, and quoted with approval in *Wallerius,* is applicable to the facts as found by the trial court here. In the opinion of that case it is stated:

"The rule is clear and well settled, and founded in absolute justice, that a party to a contract cannot prevent performance by another and derive any benefit, or escape any liability, from his own failure to perform a necessary condition. (*Dill v. Pope,* 29 Kan. 289; *Supply Co. v. Cement Co.,* 91 Kan. 509, 512, 138 Pac. 599; *Briney v. Toews,* 150 Kan. 489, 495, 95 P. 2d 355.) And this is the universal rule. (12 Am. Jur., Contracts, §§ 381, 386; 2 C. J., Agency, § 439, p. 772; 13 C. J., Contracts, §§ 721, 722, 723; Restatement, Contracts, § 315.)" (p. 146.)

The telephone conversation of December 4, 1965, terminated the contract between Sharman and Juel. Sharman had hired another driller. Juel was deprived of an opportunity to complete the performance of his guaranty to produce an 800 gallon well. Following up this conclusion, the court applied the doctrine of quantum meruit in ascertaining the amount due Juel for services performed. While Juel failed to produce an acceptable well on the Northwest Quarter of Section 33, nevertheless plaintiffs derived benefits from the drilling of Juel and Gepner. The site of well No. 1 was eliminated because of sand, that of No. 2 because of subterranean formation, which caused caving in, and that of No. 3 because of insufficient water. These efforts must have aided in locating the site of the well subsequently drilled by Hinkle.

We are cited no cases in this jurisdiction where quantum meruit was applied to a well drilling agreement not fully completed. Where a well driller was excused or prevented from completing a well, the doctrine of quantum meruit was applied in calculating compensation for the work done in *Olson v. Nonenmacher,* 63 Minn. 425, 65 N. W. 642, and *Reynolds v. Levi,* 122 Mich. 115, 80 N. W. 999. See, also, *Clute v. Mach,* 153 Nebr. 772, 45 N. W. 2d 897, and *Davis v. Merrick,* 66 N. M. 226, 345 P. 2d 1042.

In the early case of *Duncan v. Baker,* 21 Kan. * 99, what was described as the narrow, technical and illiberal rule of the common law forbidding recovery on quantum meruit after partial performance of a contract was rejected because it was not founded on justice and was contrary to what was then noted as the weight of modern authority. In that case it was held that, even though a contract had been only partially fulfilled, the party in fault may, nevertheless, recover for the actual benefit received by the other party, less damages sustained by such other party, by reason of the nonfulfillment of the contract. The abrogation of the common law in this jurisdiction, by the decision in *Duncan,* was noted in *Cooper v. Seaverns,* 81 Kan. 267, 105 Pac. 509.

The rule laid down in *Duncan* was followed in *Fritts v. Quinton,* 118 Kan. 111, 233 Pac. 1036, 40 A. L. R. 31, where it was held that compensation on quantum meruit was allowable for the partial performance of personal services, but the terms of the contract must be taken into account, and the amount of recovery must be based on the benefits conferred on the other party to the contract, less any damages sustained by such other party by reason of the breach of contract.

The application of the doctrine to a partially performed building contract, where a contract was called off by mutual consent or completion prevented by the landowner, was discussed in *Zimmerle v. Felzien,* 121 Kan. 34, 245 Pac. 1024. In the opinion it is stated:

". . . That doctrine is applicable in cases where the contract is called off by mutual consent (6 R. C. L. 976) and, perhaps, where the contractor is prevented by the owner from completing the contract, although in the latter case his measure of damages might more justly be based upon the contractor's loss of profits which would have inured to him if he had been permitted to complete his contract. (9 C. J. 729.) The law is tolerant, however, in its attitude towards building contractors who breach their contracts by voluntary noncompletion, and will award them compensation *quantum meruit* for the work actually done, if it is of some substantial benefit to the owner (6 R. C. L. 974, 975), less a proper set-off for whatever damages the latter may have sustained by the contractor's failure to complete the contract. Such set-off would necessarily include due allowance for the owner's expense in employing another contractor or other workmen to finish the job, and in eliminating and correcting defects in the work done by plaintiff. . . ." (p. 38.)

In the case at bar the trial court computed Juel's drilling on the quarter section in question on a quantum meruit basis at $6,900 and then charged Juel with a proportionate share of the expense or loss in the test drilling and pumping by Gepner and Webber. We believe the reasoning of the trial court, under the terms of the agreement and facts established in this case, falls well within the framework of the rules governing the application of quantum meruit, established by the cases we have noted.

Lastly, Juel contends that, even though quantum meruit was properly applied, the trial court erred in its mathematical calculations. Juel contends that he should have been allowed $7,376 for drilling a total depth of 922 feet at $8 a foot, rather than $6,900, as determined by the court. Juel argues that since the court found the depth of the No. 3 well to be 352 feet, and under the undisputed evidence, the depth of the No. 2 well was 240 feet, in order to arrive at the total depth of 862.5 used by the court in computing the sum

of $6,900, the court erred in allocating a depth of only 269.5 to the No. 1 well. In support of his argument Juel points out that Sharman testified that all of the wells drilled by Juel were between 320 and 350 feet deep. We find no specific reference by Sharman as to the depth of the No. 1 well. Schofield testified that he test pumped the No. 1 well for the third time on July 19, 1965, at 238 feet. Whether the well was drilled deeper is not shown in the record. In any event, the court's allocation of 269.5 feet to the No. 1 well is within the range (238 to 320 feet) of the evidence and in the absence of specific testimony on the point, we find no reason to disturb the trial court's calculations.

The judgment is affirmed.